Georgia, Florida & Alabama Railroad Company, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 60035. Promulgated August 7, 1934.

1

*A. S. Holtz, Esq.*, for the petitioner.
*E. C. Algire, Esq.*, for the respondent.

OPINION.

McMahon: This is a proceeding for the redetermination of the petitioner's liability as a transferee, for a deficiency in income taxes of the Georgia, Florida & Alabama Railway Co. (hereinafter referred to as the Railway Co.) for the year 1927 in the amount of $11,141.73. In the petition, as amended, it is alleged in substance (numbering ours) that the respondent erred in:

(1) Finding that the petitioner is a transferee of the Railway Co. under section 280 of the Revenue Act of 1926;

(2) Denying the right to take as a deduction organization expenses in the amount of $59,568.08;

(3) Denying the right to take as a deduction organization expenses in the amount of $36,956;

(4) Denying the right to take as a deduction salaries paid in the amount of $6,122.82;

(5) Denying the right to take as a deduction the amount of $4,562.09 expended for clerical hire; and

(6) Not allowing a deduction of $66,676.78 on account of the retirement from service or abandonment of certain road facilities, cars, locomotives, and shop machinery, and on account of additional depreciation on freight cars.

The petitioner prays that the Board find that there is no deficiency in tax, but that, on the other hand, the tax has been overpaid for the year 1927; hence the petitioner is entitled to a refund.

In his answer the respondent denied all of the petitioner's allegations of error and asserted a claim for any increased deficiency which might result from the redetermination.

1. The petitioner is a Georgia corporation, with principal legal office in Bainbridge, Georgia, and principal accounting office in Portsmouth, Virginia.

On June 9, 1927, the Railway Co., a Georgia corporation, and Leon S. Freeman, F. L. Fuller, and J. S. Fuller, acting for and on behalf of a corporation to be formed under the laws of Georgia and to be called the Georgia, Florida & Alabama Railroad Co. (the petitioner in the instant proceeding), entered into an agreement whereby it was provided in part that the Railway Co. would transfer and the new corporation would receive all the right, title, and interest of the Railway Co. in its lines of railway and other property and assets, real, personal, and mixed; that the deed of

conveyance should provide that the new corporation, as part of the consideration for such properties, should assume and pay "all obligations and liabilities of whatsoever character payable by the Railway Company whether then due or thereafter to become due"; that the new corporation, in addition to assuming the obligations and liabilities of the Railway Co., should transfer and deliver to the Railway Co. $1,750,000 principal amount of first mortgage 6 percent bonds, to be secured by mortgage and deed of trust upon the property to be received by the new corporation, $1,000,000 par value of the full paid and nonassessable 5 percent first preferred stock of the new corporation, consisting of 10,000 shares of $100 par value each, $500,000 par value of the full paid and nonassessable second preferred stock of the new corporation, consisting of 5,000 shares of $100 par value each, and 10,000 shares of the no par value common stock of the new corporation; that the new corporation should enter into an agreement of lease with the Seaboard Airline Railway Co. (hereinafter referred to as the Seaboard); that the Railway Co. would promptly make application to the Interstate Commerce Commission for authority to transfer and deliver all of the securities to be received by it from the new corporation to its stockholders pro rata in proportion to their holdings as a liquidating dividend of the Railway Co., such company to be ultimately dissolved; that the expenses in connection with the incorporation of the new corporation and the issuance of several classes of its capital stock, the preparation and delivery of the proposed mortgage and bonds issued thereunder, and the preparation of the lease to the Seaboard, and all stamps, recording fees, proceedings before the Interstate Commerce Commission, printing bills, trustees' counsel fees, and the reasonable fees and expenses of Van Vorst, Siegel & Smith in connection with the foregoing, the reasonable fees and expenses of Philip Weltner, and 50 percent of the reasonable fees and disbursements of Hornblower, Miller & Garrison in connection with the foregoing, should be recognized as liabilities and obligations of the Railway Co. and payable out of its assets, but that no other expenses or disbursements whatsoever in connection with the proposed transfer and conveyance of the properties, the incorporation of the new corporation, the issuance of its securities, and the making of the lease should be paid from the assets of the Railway Co. except, however, in addition thereto, any other expenses or disbursements which might be expressly approved in writing by J. L. Nesbit and the Seaboard; and that the obligations of the Railway Co. under the agreement should be predicated upon the contemporaneous execution by Freeman and the Fullers of a contract with the Seaboard providing for an agreement of lease. In this agreement the Rail-

4

way Co. represented that its assets and liabilities as of September 30, 1926, were correctly set forth in an attached balance sheet, and that at the time of the agreement the company was in at least as good financial condition as that set forth in the balance sheet. Such balance sheet shows that the Railway Co. had an investment in road and equipment and miscellaneous physical property of $3,994,966.24; current assets of $386,095.84, of which $103,660.72 was cash; long term debt of $784,986.13; and current liabilities of $317,752.80. The excess of all assets over all liabilities, without taking into consideration capital stock, was $3,195,752.59.

On the same date, June 9, 1927, Leon S. Freeman, F. L. Fuller, and J. S. Fuller, acting on behalf of the new corporation to be organized (the petitioner), entered into a second agreement, which was with the Seaboard, providing for the execution of a lease by the petitioner to the Seaboard of the properties it was to acquire from the Railway Co. Therein the Seaboard was designated the sole representative and attorney of the petitioner for the purpose of making all the inspections, examinations, and audits as provided in the first or sale agreement above referred to. Therein the Seaboard agreed to make application to the Interstate Commerce Commission for authority to acquire control of the petitioner by a lease and by the purchase of all of the voting common stock of the petitioner. Therein Freeman and the Fullers, individually and not on behalf of the petitioner, agreed to cause to be transferred to the Seaboard as a consideration for making the lease and agreeing to pay as rental the dividends upon the preferred stock, 10,000 shares of the common stock of the petitioner. Therein it was recognized that the expenses in connection with the incorporation of the petitioner referred to in the first agreement of June 9, 1927, above referred to, constituted liabilities and obligations of the Railway Co. and were payable out of its assets. It was also agreed therein that upon the effective date of the lease the written resignations of all directors and officers of the petitioner would be tendered to the petitioner and that there would be elected to fill the vacancies as directors such directors as might be designated by the Seaboard.

The petitioner was duly organized under the laws of Georgia on July 16, 1927. By deed dated August 1, 1927, but which became effective as of January 1, 1928, the Railway Co. transferred all of its assets to the petitioner. Such deed provided in part as follows:

That the said Grantor, for and in consideration of the delivery to it of One Million Seven Hundred and Fifty Thousand Dollars ($1,750,000) principal amount of First Mortgage and Refunding 6% Gold Bonds, Series A, of the Grantee, of One Million Dollars ($1,000,000) First Preferred Stock, of Five Hundred Thousand Dollars ($500,000) Second Preferred Stock and of 10,000 shares without par value of Common Stock on the Grantee, at the sealing and

delivery of these presents, the receipt of all of which is hereby acknowledged, and in further consideration of the assumption by the Grantee of the obligations and liabilities of the Grantor, has granted, bargained, sold, aliened, conveyed and confirmed and by these presents does grant, bargain, sell, alien, convey and confirm unto the said Grantee, its successors and assigns: [Then follows description of property.]

The petitioner executed a lease of all of such assets to the Seaboard for 99 years. Such lease is dated August 1, 1927, but it became effective as of January 1, 1928, by subsequent agreement entered into January 6, 1928. The Seaboard took over all the net current assets and liabilities of the Railway Co. under the lease and entered them upon its books. The Seaboard credited the petitioner, upon the receipt of the assets, and as the Seaboard made payments out of the net assets it charged the petitioner's account on its books. The petitioner on its books credited the Seaboard with any payments which the Seaboard made out of the net assets. The Seaboard was acting as agent in the handling of these net current assets.

As of December 31, 1927, the Railway Co. made entries in its books of account recording the transfer of its assets to the petitioner. The balance sheet as of December 31, 1927, attached to the return filed by the Railway Co. for the year 1927, shows investments in the amount of $4,098,557.45, including road and equipment in the amount of $4,092,680.66, current assets of $358,738.77, of which $170,218.73 consisted of cash, current liabilities of $100,121.40, and long-term debt of $650,000. The excess of assets over liabilities, without taking into consideration capital stock, was $3,408,519.67. At this same time the petitioner recorded the assets upon its books of account. In determining the value of the property, rights, and franchises for this purpose, the petitioner used the values ascertained by the Interstate Commerce Commission as of June 30, 1917, in its valuation docket 674, reported in 121 I.C.C. Valuation Reports at page 419, plus additions and betterments made from July 1, 1917, to December 31, 1927. The value thus fixed for road and equipment was $4,210,009.98, which was in excess of the amount at which the Railway Co. carried road and equipment on its books. Assets other than " property, rights and franchises " shown as received from the Railway Co. were valued at $435,059.51.

The preferred stock and the bonds of the petitioner were, under instructions and resolutions of the Railway Co., issued directly to the stockholders of the Railway Co. The provision in the agreement that the 10,000 shares of common stock of the petitioner were to be delivered to the Railway Co. was, by agreement, deviated from to the extent that such stock was issued directly to the Seaboard, the party designated by the Railway Co. to receive it. The Seaboard, in consideration therefor, paid $1,000 in cash and joined in the lease.

The common stock carried voting rights, but the preferred stock did not, except under specified conditions, such as default in payment of dividends, which we need not detail here. The Seaboard was not a stockholder of the Railway Co.

The Railway Co. has never been dissolved. It could not be dissolved while the equipment trust was outstanding. It has had no assets since the transfer of its assets to the petitioner. It never directly received any of the securities which were issued by the petitioner.

As appears from the notice dated July 29, 1931, which forms the basis for this proceeding, the respondent determined that the petitioner is liable as transferee of the Railway Co. under section 280 of the Revenue Act of 1926, for a deficiency in taxes of that company for the year 1927 in the amount of $11,141.73. This amount was assessed by the respondent on December 6, 1930, against the Railway Co. together with interest to December 6, 1930, in the amount of $1,821.14. This assessment has never been collected from the Railway Co.

The net fair market value of the assets received by the petitioner from the Railway Co. was, at the time the assets were received, in excess of the tax liability herein in controversy.

The first question presented is whether the petitioner is liable, as transferee, for any deficiency in tax due from the Railway Co. The date of the conveyance of the assets of the Railway Co. to the petitioner was January 1, 1928, at which time all the events had transpired which gave rise to the tax liability of the Railway Co. for the year 1927, although such liability had not been determined. The securities of the petitioner which constituted part payment for the assets of the Railway Co. were paid directly to the stockholders of the Railway Co. and the evidence shows that after transferring its assets to the petitioner the Railway Co. has never had any assets. The net assets received by the petitioner had a value in excess of the tax liability here involved. As a part of the consideration for the assets of the Railway Co., the petitioner assumed and agreed to pay the obligations and liabilities of the Railway Co. Clearly under these circumstances the petitioner is liable both at law and in equity for any deficiency in tax which there may be against the Railway Co. *Continental Baking Co.*, 27 B.T.A. 884, and cases therein cited; *American Equitable Assurance Co. of New York*, 27 B.T.A. 247; affirmed in *American Equitable Assurance Co. of New York* v. *Helvering*, 68 Fed. (2d) 46; and *United States Trucking Corp.*, 29 B.T.A. 940.

The petitioner contends that before the respondent may proceed against the transferee he must first exhaust all available remedies

against the transferor, and that the respondent must here fail because he has not shown that he has proceeded to collect from the transferor. This contention is, in our opinion, entirely without merit as to the petitioner's liability at law under its contract with the Railway Co. *American Equitable Assurance Co. of New York*, *supra*, and *American Equitable Assurance Co. of New York* v. *Helvering*, *supra*. Furthermore, even in cases where the equitable liability of a transferee is being asserted, where proceedings against the transferor would be futile, the transferee liability may be asserted without exhausting the remedies against the transferor. *B. F. Fairless*, 19 B.T.A. 304; *Mrs. U. H. Butler*, 24 B.T.A. 506; *John Thomson, Jr.*, 20 B.T.A. 1; *United States* v. *Fairall*, 16 Fed. (2d) 328; and *United States* v. *Garfunkel*, 52 Fed. (2d) 727. Here the evidence shows that it would have been futile to proceed against the Railway Co., since it had no assets.

2, 3. The expenses incurred in the organization of the petitioner for which the Railway Co. became liable under the terms of the sale agreement of June 9, 1927, amounted to $59,568.08. During the year 1927 the Railway Co.'s accounts were kept on the accrual basis. The full amount of $59,568.08 was paid out of the assets of the Railway Co. by the Seaboard in accordance with its lease agreement of the same date, except $1,486.17 which was paid out in 1927 by the Railway Co. All that amount which was paid out by the Seaboard was paid out during 1928, except one $2 item which was paid in 1929. Of the total amount of $59,568.08, only $49,941.40 was recorded on the books of the Railway Co. This amount of $49,941.40 was accrued and charged to profit and loss account on the books of the Railway Co. prior to closing its accounts for 1927.

In its return for the year 1927 the Railway Co. claimed a deduction on account of expenses in the organization of the petitioner in the amount of $49,970.40, which was disallowed by the respondent on the ground that they were capital expenditures.

The organization expenses incurred by the Railway Co. at its own inception can not be ascertained from its records. The items are not segregated in the accounts. G. R. Summerson, valuation auditor of the Seaboard, made an attempt to ascertain such organization expenses, but was unable to do so. In the Interstate Commerce Commission's valuation docket 674, reported in 121 I.C.C. Valuation Reports, at page 419, which is a report on a proceeding for the purpose of fixing final value for rate-making purposes of the property of the Georgia, Florida & Alabama Railway Co. as of June 30, 1917, the Interstate Commerce Commission listed organization expenses, general officers and clerks, law, stationery and printing, taxes, and other expenses, general, in the aggregate amount of $36,956. This

figure does not purport to be the actual cost of such items to the Railway Co., but represents cost of reproduction new. The figure of $36,956 is not allocated in such report as among the various items.

We will first consider the petitioner's contention with regard to the deductibility by the Railway Co. of expenditures made by it and by the Seaboard, as agent, in the amount of $59,568.08 in connection with the organization of the petitioner, to which the Railway Co. transferred its assets. In *Odorono Co.*, 26 B.T.A. 1355, we held under somewhat similar circumstances that attorney fees paid are not deductible as ordinary and necessary business expenses or as losses. We there stated in part:

Regardless of whether or not the amounts here in dispute may be classified as capital expenditures, we are of opinion that they were not ordinary and necessary expenses of carrying on a business.

The petitioners contend, in the alternative, that the attorney's fees, if representing capital expenditures, are nevertheless deductible as losses, under the provisions of section 23 (f) of the 1928 Act, which losses were incurred upon their dissolution within the taxable year.

There is no merit in this contention. There is nothing in the evidence to indicate, and it is not claimed by the petitioners, that there was any loss upon the transfer of the petitioners' assets to the Northam Warren Corporation. We assume, in the absence of evidence to the contrary, that the transaction was mutually beneficial to all of the parties concerned and that value was received by the petitioners on account of the expenditures for the attorney's fees.

What was said in the above quoted case applies with equal force here. We hold that the amount of $59,568.08 is not deductible in computing net income of the Railway Co. for the year 1927.

Respondent contends that the amount of $59,568.08 is not deductible as a loss, since it was in connection with a reorganization within the meaning of section 203 (b)(3) of the Revenue Act of 1926, which provides that no gain or loss shall be recognized in the case of an exchange of property for stock or securities of another corporation, a party to a reorganization. However, in view of the conclusion we have here reached on this issue, it is unnecessary to decide whether there was such a reorganization within the meaning of this section.

The petitioner contends, in the alternative, that if the Railway Co. is not entitled to deduct the above amount then it, the Railway Co., should be allowed to deduct in 1927 the organization expenses incurred by it at its own inception, on the theory that, since after 1927 it ceased to function, such expenses became a loss in that year. Such organization expenses can not be ascertained from the records of the Railway Co. The items are not segregated in the accounts. G. R. Summerson, valuation auditor of the Seaboard, made an attempt to ascertain the organization expenses, but was unable to do so. He testified that a comparable figure of this organization

expense was found by the Interstate Commerce Commission in its valuation docket, above referred to, in the amount of $36,956. However, that figure purports to represent organization expenses, general officers and clerks, law, stationery and printing, taxes, and other expenses, general, in an amount of $36,956. This figure does not purport to be the actual cost of such items to the Railway Co. but purports to represent cost of reproduction new. Furthermore, we are not advised as to what portion of the $36,956 is allocable to organization expense. It should be further noted that the evidence shows that the Railway Co. has never surrendered its charter. However, whether the original organization expenses of the Railway Co. might be deducted by it in 1927 under the circumstances here shown if such expenses were proved, we find it unnecessary to decide. Suffice it to say that we are precluded from allowing them for the reason that the amounts thereof which were actually expended have not been shown.

4. At an annual meeting of the board of directors of the Railway Co. held on April 19, 1927, R. B. Coleman, D. B. Scott, W. A. Oliff, and L. J. Papy were elected, respectively, general manager, auditor, traffic manager, and secretary-treasurer and purchasing agent, to hold office according to the bylaws of the Railway Co., their salaries to be upon an annual basis, but payable monthly. During the period from January 1 to April 17, 1928, there was paid to these officers the sum of $6,122.82 on account of salaries for such period. These salaries were paid by the Seaboard and were charged to the account of the Railway Co. The Railway Co. had ceased to do any business after January 1, 1928, but these salaries were paid because the officers had been elected on April 19, 1927, on an annual salary basis for one year, payable monthly.

The petitioner contends that in computing the tax liability of the Railway Co. for the year 1927 the above amount of $6,122.82 should be allowed as a deduction. As stated above this amount represents salaries paid to four of the Railway Co.'s officers for the period January 1 to April 17, 1928, during which time the Railway Co. was, for all practical purposes, dormant. It is contended by the petitioner that the election of the officers on April 19, 1927, for the term of one year thereafter carried with it the obligation to pay the salaries for the full term; that since such obligation arose in 1927 the salaries are ordinary and necessary expenses of that year within the purview of section 234 (a) (1) of the Revenue Act of 1926,[1] and

---

[1] SEC. 234. (a) In computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions:

(1) All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered * * *.

are hence deductible. It is to be noted that section 234 (a) (1), *supra*, provides for the deduction of a reasonable allowance for salaries or other compensation for personal services *actually rendered*. Here the amount in question does not even purport to be for any services *actually rendered* in the taxable year 1927. As we interpret the statute the amount in question is not an allowable deduction.

5. During 1928 and 1929 the Seaboard paid out of the net assets of the Railway Co. a total amount of $4,562.09 to cover salaries and expenses of a clerical force employed in closing the accounts of the Railway Co. and in preparing governmental reports with regard to that company. The services for which this amount was paid were rendered in 1928 and 1929.

The petitioner contends that there should be allowed as a deduction in computing the net income of the Railway Co. for the year 1927 the above amount of $4,562.09. The services for which this amount was paid were not rendered in 1927. The evidence shows that the services were rendered during 1928 and 1929. Under the provisions of section 234 (a) (1) of the Revenue Act of 1926 herein quoted, this amount is not deductible in computing the net income of the Railway Co. for the year 1927.

It may be observed in passing that section 234 (a) (1), *supra*, provides for the deduction of a *reasonable allowance* for salaries or other compensation. The petitioner has not shown that the amounts in question, $6,122.82 and $4,562.09, constituted *reasonable allowances* within the meaning of the statute.

6. During 1927 the Railway Co. withdrew from transportation service certain road facilities. They are not shown on the books of the Railway Co. as having been retired in 1927, one reason being that D. B. Scott, the auditor, had no supporting papers from the roadway department showing that these items had been closed out. J. L. Nisbet, president of the Railway Co. in 1927, had issued general instructions that all property which was not in use and had been abandoned should be retired at the end of the year. These assets were included in the statement of assets transferred to the petitioner as of January 1, 1928. No report to the Interstate Commerce Commission was made at the end of the year 1927 or in January 1928 of the retirement of these facilities, as was customary. All these facilities were in bad physical condition in 1927, were unusable, and some were unsafe. They were not actually torn up and carted away. Such assets, together with their cost, when proved, and their net salvage values, which include the cost of effecting abandonment, are as follows:

| Item | Cost | Net salvage value |
|------|------|-------------------|
| Motor car turntable at Carrabelle, Fla | $230.73 | $6.00 |
| Motor car turntable, 150 ft. of house track, 5,480 sq. ft. of open platform, docks, spirit house 14'x20', old freight house and 290 sq. ft. of platform at McIntyre, Fla | | (Dr.) 209.44 |
| Spur track, old freight house and platform at Rickers Mill, Fla | | 140.32 |
| Sawmill, office, depot and platform at Helen, Fla | | (Dr.) 100.00 |
| Fuller siding at Sweeney, Fla | | 47.49 |
| South switch and 156 ft. of Majors spur on Quincy Branch | 504.45 | 47.79 |
| Reid Lumber Co. spur on Quincy Branch | 368.01 | 81.19 |
| Combination station and covered platform at Hinson, Fla | | (Dr.) 200.00 |
| Total | 1,103.19 | |

Those facilities, the cost of which is here shown, were constructed after June 30, 1917. The others were constructed before that date.

The Railway Co. carried no depreciation charge on the right of way, the theory being that the roadbed and right of way appreciated from year to year. That contention has been made before the Interstate Commerce Commission for years. When any of the roadbed material became obsolete or was worn out it was retired outright and charged off directly against whatever might have been the proper account, less the salvage value. That was customarily done at the end of every year.

In 1927 J. L. Nisbet ordered locomotive No. 102 to be withdrawn from service because it was unfit and the cost of repairs would be excessive. He also ordered withdrawn passenger train cars Nos. 50 and 91 subsequent to October 15, 1927. These cars had wooden underframes. The cars were in very poor condition and were becoming dangerous. Nisbet also ordered fourteen freight cars and a cab withdrawn from service in the latter part of 1927. They all had wooden underframes. All of this equipment had become obsolete and practically worn out. It was all withdrawn from transportation service in 1927. This property had been acquired at various dates between 1898 and 1923. The locomotive, one passenger car, and five freight cars were acquired after March 1, 1913, but the remainder of the property was acquired prior to that time. In 1927 it had a total net salvage value of $3,828. All this property was taken over by the petitioner when it acquired the assets of the Railway Co.

In 1927 the Railway Co. withdrew from service a wheel press which had been bought in the summer of 1923 for a price of $2,400. Its net salvage value in 1927 was $15. This wheel press was cracked in two. No depreciation was ever written off on this wheel press during the time the Railway Co. had it.

In 1927 the Railway Co. owned 133 freight cars and three cabs, which were acquired from 1898 to 1925. The total cost of all this property was $83,761.80, and its salvage value at December 31, 1927,

was $14,954. All of these cars were of wooden underframe construction. They were in bad condition in 1927. They had been maintained through 1926, but in 1927 the Railway Co. had acquired steel underframe equipment and as a matter of safety the company in 1927 was using the old equipment as little as possible. Furthermore, it cost as much to repair one of these old cars as to buy a new wooden one. This equipment was obsolete in 1927. It had only salvage value at the end of the year 1927. It had been known for years that these cars were expensive to operate and were becoming obsolete. The only reason the company did not replace them earlier was because it could not afford to do so. None of the cars were dismantled in 1927. The company could not find a market for them.

This last issue relates to the deduction in the amount of $66,676.78, claimed by the petitioner as a deduction in computing the net income of the Railway Co. for the year 1927. This amount is made up of an amount of $9,401.70 claimed as a loss upon the retirement of "road facilities" consisting of turn tables, track, platforms, depots, sidings, switches, etc.; an amount of $11,305.36 claimed as a loss upon the retirement of a locomotive, two passenger train cars, 14 freight train cars, and a cab; an amount of $9,912 claimed as a loss upon the retirement of shop machinery; and an amount of $36,057.72 claimed as depreciation sustained on freight cars and cabs in addition to the amount previously claimed by the Railway Co. We are concerned with section 234 (a) (4) and (7), section 204 (a) and (b), and section 202 (a) and (b) (1) and (2) of the Revenue Act of 1926.[2]

With regard to road facilities, the petitioner showed the cost of only three of the items. These three items were acquired after June 30, 1917. The remainder were acquired prior to that date and may have been acquired prior to March 1, 1913, for all we know. As to such remaining items we have no proof as to either their cost or their

---

[2] SEC. 234. (a) In computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions:

\*　　　\*　　　\*　　　\*　　　\*　　　\*

(4) Losses sustained during the taxable year and not compensated for by insurance or otherwise. \* \* \* The basis for determining the amount of the deduction for losses sustained shall be the same as is provided in section 204 for determining the gain or loss from the sale or other disposition of property;

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(7) A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence;

SEC. 204. (a) The basis for determining the gain or loss from the sale or other disposition of property acquired after February 28, 1913, shall be the cost of such property; \* \* \*

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(b) The basis for determining the gain or loss from the sale or other disposition of property acquired before March 1, 1913, shall be (A) the cost of such property (or, in the case of such property as is described in paragraph (1), (4), or (5) of subdivision (a), the basis as therein provided), or (B) the fair market value of such property as of March 1, 1913, whichever is greater. \* \* \*

fair market value at March 1, 1913. The locomotive, one passenger train car, and five freight cars, which were retired in 1927, were acquired after March 1, 1913, but the other passenger train car and the remaining freight cars, which were retired, were acquired prior to March 1, 1913. There is no proof of the cost or March 1, 1913, value of this property. The petitioner proved that certain amounts were entered on the books as cost, but this was not received as proof of the actual cost. It was received merely to show that such book entries were made. With regard to the amount of $9,912 claimed as a deduction for shop machinery, the petitioner proved the retirement of only one item, namely, a wheel press which had been purchased in the summer of 1923. With regard to each and every one of these items of property retired the petitioner has failed to show the amount of depreciation which since the acquisition of the property has been allowable in respect of such property under the Revenue Act of 1926 or prior income tax laws, or the amount of any depreciation which may have been actually sustained upon any of such property prior to March 1. 1913. The petitioner has thus failed to meet the requirements of section 202 (b) (2), *supra*. Since the petitioner has not proved the elements required by the statute, we are precluded from allowing any deduction whatsoever in this regard. It is true that with regard to some of the items the petitioner has shown the depreciation as recorded on its books, but we have no way of knowing that this is the correct amount of depreciation. At the hearing counsel for the respondent stated that he did not object to this proof for the purpose of showing depreciation entered on the books, but that he did not thereby admit that those figures were the correct amount of depreciation. The exhibits were received for the limited purpose of showing the depreciation recorded upon the books and not for the purpose of showing the correct amount of depreciation. In spite of this the petitioner did not introduce any evidence as to the actual depreciation.

The amount of $36,057.72 claimed as depreciation sustained on freight cars and cabs, in addition to the amount of $2,085.81 pre-

SEC. 202. (a) Except as hereinafter provided in this section, the gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the basis provided in subdivision (a) or (b) of section 204, and the loss shall be the excess of such basis over the amount realized.

(b) In computing the amount of gain or loss under subdivision (a)—

(1) Proper adjustment shall be made for any expenditure or item of loss properly chargeable to capital account, and

(2) The basis shall be diminished by the amount of the deductions for exhaustion, wear and tear, obsolescence, amortization, and depletion which have since the acquisition of the property been allowable in respect of such property under this Act or prior income tax laws; but in no case shall the amount of the diminution in respect of depletion exceed a depletion deduction computed without reference to discovery value or to paragraph (2) of subdivision (c) of section 204. In addition, if the property was acquired before March 1, 1913, the basis (if other than the fair market value as of March 1, 1913) shall be diminished in the amount of exhaustion, wear and tear, obsolescence, and depletion actually sustained before such date.

viously claimed by the Railway Co., is arrived at by the petitioner by subtracting from the depreciated cost as shown by the entries in the books of the Railway Co. at December 31, 1926, the salvage value as of December 31, 1927, and then deducting from the remainder the depreciation already claimed by the Railway Co. during the year 1927. The petitioner's claim is founded on section 234 (a) (7) of the Revenue Act of 1926. It is not claimed that a loss was sustained from retirement of these cars and cabs from service. An exhibit was received in evidence in part showing the accrued depreciation at December 31, 1926, as shown by the books of the Railway Co., the depreciated cost at December 31, 1926, as shown by these books, and the depreciation accrued during the year 1927 as shown by the same books. This exhibit, in so far as these three items are concerned, was received for the limited purpose of showing that these three items were entered in the books; not for the purpose of showing the actual amount of depreciation sustained in 1927 or prior thereto. There is no evidence to prove that the depreciation as shown on the books is the correct amount of depreciation sustained. We do know from the evidence that for many years it had been known that the cars in question were becoming obsolete. Obsolescence is deductible over the period of obsolescence. *Loewers Gambrinus Brewery Co.* v. *Anderson*, 282 U.S. 638. It appears here that the obsolescence period extended over an undisclosed number of years prior to 1927. Thus an undisclosed portion of the amount here claimed by the petitioner as depreciation was sustained in prior years as obsolescence. From the evidence we can not determine what portion of the obsolescence was sustained in the year in question. This contention of the petitioner therefore fails.

Reviewed by the Board.

*Decision will be entered for the respondent.*

VAN FOSSAN and LEECH concur in the result.